12 CV 7961

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

SECURITIES AND EXCHANGE
COMMISSION,

      Plaintiff,

  v.

8000, INC., JONATHAN E. BRYANT,
THOMAS J. KELLY, and CARL N. DUNCAN,

      Defendants.

</td><td>

Civil Action No.

JURY TRIAL DEMANDED

</td></tr>
</table>

RECEIVED
SEP 27 2012
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following

against defendants 8000, Inc. ("EIGH"), Jonathan E. Bryant ("Bryant"), Thomas J. Kelly

("Kelly"), and Carl N. Duncan ("Duncan") (collectively, "Defendants"):

### SUMMARY

1.     This case involves a scheme to inflate the volume of trading in EIGH's common

stock and the company's stock price and to profit from that rise. In October 2009, Bryant

acquired control of EIGH and appointed Kelly its Chief Executive Officer ("CEO"). He also

retained Duncan as the company's securities counsel. Working together over a twelve month

period, the Defendants increased the company's stock price as they sold the company's restricted

securities into the market.

2.     The Defendants' scheme had two facets which they executed simultaneously.

One facet involved Bryant's and Kelly's dissemination of financial reports and press releases

1

falsely reflecting that EIGH had millions of dollars in capital and revenues. The other facet involved Duncan supplying OTC Markets Group, Inc. ("OTC Markets") and EIGH's transfer agent with false legal opinions. The opinions that Duncan provided OTC Markets assured that EIGH's common stock was quoted in a central market widely available to investors. The opinions that he provided the transfer agent enabled Bryant to acquire stock certificates without restrictive legends for EIGH's restricted securities, thereby allowing Bryant to sell 56.8 million EIGH shares into the market that he could not have otherwise sold.

3.      The Defendants' combined efforts increased the volume of trading in EIGH by 93% between November 2009 and October 2010, and the company's stock price from less than $0.01 to $0.42 per share. Further, Bryant and Kelly earned substantial profits through the scheme. Bryant paid Duncan more than $15,000 from his trading profits for Duncan's services. Bryant also gave one million shares of EIGH's common stock to Duncan. The Commission issued an order on November 4, 2010, suspending trading in EIGH's securities.

4.      By engaging in the scheme to increase the volume of trading in EIGH's securities and the company' stock price, Defendants violated the antifraud provisions of the federal securities laws. Bryant and Duncan also violated the securities registration provisions of the federal securities laws by participating in the sale of EIGH's restricted securities.

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)] and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d)]. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331, Section

2

22(a) of the Securities Act [15 U.S.C. §77v(a)], and Sections 21(d) and (e) and 27 of the Exchange Act [15 U.S.C. §§78u(d) & (e) and 78aa].

6.      Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(2), Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], and Section 27 of the Exchange Act [15 U.S.C. §78aa] because a substantial part of the acts constituting the alleged violations occurred in the Southern District of NewYork, because EIGH's common stock was quoted under the symbol "EIGH" on OTC Pink ("Pink Sheets"), a quotation service for over-the-counter securities operated by OTC Markets, which is headquartered in New York. Also as alleged in the Complaint, financial reports and opinion letters were filed with OTC Markets that contained material misrepresentations.

7.      In connection with the conduct alleged in this Complaint, the Defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

8.      The Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and/or resulted in substantial loss, or significant risk of substantial loss, to other persons.

9.      Unless enjoined, the Defendants will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

## DEFENDANTS

10.     **8000, Inc. ("EIGH")** is a Nevada corporation with a principal place of business in Manassas, Virginia. It does not file reports with the Commission nor are its securities registered. Between December 2007 and November 2010, EIGH's common stock was quoted under the symbol "EIGH" on OTC Pink ("Pink Sheets"), a quotation service for over-the-counter

securities operated by OTC Markets.  On November 4, 2010, the Commission suspended trading

in EIGH's securities for ten days.  EIGH is currently traded in the Grey Market with other

securities that are not centrally listed on any stock exchange or quoted on the OTC Bulletin

Board or Pink Sheets.  EIGH's common stock is and has always been a "penny stock" as that

term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. §78c(51)].

      11.     **Jonathan E. Bryant ("Bryant")**, age 46, is a citizen of the United Kingdom who

resides, on information and belief, in Hole Town, Barbados.  Bryant has controlled EIGH and its

operations since at least October 2009.  However, he did not appoint himself an officer of the

company until August 2011, when he replaced Defendant Thomas J. Kelly as CEO.

      12.     **Thomas J. Kelly ("Kelly")**, age 44, is a citizen of the United States who resides

in Levittown, Pennsylvania.  Kelly served as EIGH's CEO and its only director from October

2009 through July 2011.

      13.     **Carl N. Duncan ("Duncan")**, age 66, is a citizen of the United States who

resides in Bethesda, Maryland.  Duncan is an attorney, a member of the bar of the District of

Columbia, and a sole practitioner.  Duncan provided legal services to EIGH and Bryant from at

least January 2007 to November 2011.

### FACTUAL ALLEGATIONS

### A. BRYANT ACQUIRED A CONTROLLING STOCK INTEREST IN EIGH.

      14.     In October 2009, Bryant entered into an agreement with the then CEO of EIGH to

acquire control of EIGH from him (hereinafter the "Former CEO").  The Former CEO had

served as CEO of EIGH and as the company's only officer since August 2007.

      15.     The Former CEO agreed to convey control of EIGH to Bryant by selling to

Bryant all of his stockholdings in EIGH except for a portion equivalent to 10% of EIGH's

outstanding common stock. The shares that the Former CEO agreed to transfer bore "restrictive legends." The Former CEO also agreed to resign his position as CEO of the company, and to change the registration of the stock certificates for the shares he was conveying to Bryant when and as directed by Bryant. On October 23, 2009, the Former CEO resigned his position.

16. On October 24, 2009, the Former CEO transferred control of at least 52 million of the 83,432,250 shares of EIGH registered in his name to Bryant. He transferred an additional 17.7 million shares registered in his name to Bryant by March 23, 2010.

17. The 52 million shares that the Former CEO transferred to Bryant on October 23, 2009, represented 48% of EIGH's outstanding common stock at the time. Bryant became EIGH's controlling stockholder as a result of the transfer.

18. Bryant paid the Former CEO between approximately $80,300 and $96,407 for the 69.7 million EIGH shares in total that he received from him. Following the transfers to Bryant, the Former CEO held 13,732,250 shares, which represented 10% of EIGH's outstanding securities in March 2010.

19. Bryant did not immediately reregister the shares that he acquired from the Former CEO or register all of the shares in his own name. Rather, on various occasions between November 2009 and April 2010 and with the acquiescence of the Former CEO, Bryant directed EIGH's transfer agent to cancel the stock certificates for the shares registered in the Former CEO's name and to issue new certificates for 29.5 million shares registered in his name and for 37.5 million shares registered in the name of a company from whom he obtained purported loans collateralized by the securities (the "Loan Company").

## B. DUNCAN OBTAINED STOCK CERTIFICATES WITHOUT RESTRICTIVE LEGENDS FOR BRYANT'S SECURITIES

20.    None of the shares that Bryant acquired control of from the Former CEO were registered with the Commission. Moreover, all 67.9 million shares were restricted securities because Bryant acquired them from an affiliate of EIGH, the Former CEO.

21.    Restricted securities cannot be resold absent an exemption from the securities registration requirements of the federal securities laws. Stock certificate for restricted securities should therefore bear restrictive legends disclosing the restriction. With Duncan's assistance, however, Bryant obtained stock certificates without restrictive legends from EIGH's transfer agent for all of the restricted securities that he acquired from the Former CEO. Duncan obtained for Bryant the certificates free of a restrictive securities legend by providing EIGH's transfer agent with at least six opinion letters falsely stating that the Former CEO and Bryant were not affiliates of EIGH.

22.    Duncan represented in the opinion letters he supplied to EIGH's transfer agent that the Former CEO was not an affiliate of EIGH although Duncan had served as EIGH's securities counsel since 2007 and had prepared earlier opinion letters reflecting the Former CEO's position and controlling stock interest in the company. Duncan also failed to confirm the Former CEO's holdings in EIGH stock with EIGH's transfer agent when he prepared the opinion letters. Furthermore, Duncan stated in the opinion letters that the Former CEO resigned his position in May 2009 although a corporate resolution EIGH filed with OTC Markets reflected that the Former CEO resigned his position as of October 23, 2009. Furthermore, in October 2009 EIGH filed a report with the Nevada Secretary of State reflecting a change in its CEO.

23.    Duncan represented in the opinion letters he supplied to EIGH's transfer agent that Bryant was not an affiliate of EIGH despite learning through conversations with Bryant that

6

on October 23, 2009 Bryant had acquired 52 million shares, or 48% of EIGH's outstanding securities, from the Former CEO. Duncan also knew that Bryant, once he obtained a controlling stock interest in EIGH, was directing its operations. Bryant had engaged Duncan as EIGH's securities counsel, Duncan communicated almost exclusively with Bryant concerning EIGH's business and securities, and Bryant personally paid Duncan for the legal services he provided the company.

24.     On the occasions when Bryant directed EIGH's transfer agent to register stock certificates in the name of the Loan Company, Duncan's legal opinions also falsely stated that the Loan Company had acquired the shares from the Former CEO rather than Bryant. However, Bryant informed Duncan that he, not the Former CEO, was using EIGH's securities as collateral to obtain a loan from the Loan Company. It was also Bryant, and not the Former CEO, who requested that Duncan provide the opinion letters to EIGH's transfer agent for the securities registered to the Loan Company. Duncan never communicated with the Former CEO about the opinion letters or the Loan Company.

## C. BRYANT AND KELLY DISSEMINATED FINANCIAL REPORTS AND PRESS RELEASES REFLECTING FICTITIOUS CAPITAL AND REVENUES FOR EIGH.

25.     After acquiring a controlling stock interest in EIGH, Bryant appointed Kelly the company's CEO. Not long thereafter, Bryant and Kelly began their efforts to increase the volume of trading in EIGH's securities and the company's stock price by disseminating false information about the company.

26.     Between November 2009 and October 2010, EIGH issued several financial reports and numerous press releases concerning its operations and financial condition. All of the reports and the releases were drafted by Bryant and reviewed by Kelly. Bryant and Kelly

disseminated the financial reports by submitting them to OTC Markets, which published the reports on its Website.  They disseminated the press releases through a newswire service.

27.     The financial reports and the press releases generally reflected that EIGH was well capitalized and had acquired and was operating several profitable businesses.  In truth, this was not the case.

28.     For example, on November 7, 2009 and May 19, 2010, Bryant and Kelly published financial reports for EIGH for the third quarter 2009 and the first quarter 2010, respectively, on OTC Markets stating that EIGH had access to $75 million in capital financing. On February 23, 2010, they also caused EIGH to issue a press release announcing that the company had drawn down $10 million of the capital financing.  In fact, EIGH never had capital financing, and it never drew funds down from any loan or credit line.

29.     Further, in the February 23, 2010 and March 2, 2010 EIGH press releases that Bryant and Kelly caused EIGH to issue, EIGH represented that it had purchased six residential properties in the United States valued at $1.5 million and that it had begun building a sportswear store in Barbados using the proceeds from the fictitious capital financing.  EIGH has never acquired any real estate in the United States. The company has also never built or commenced building a sportswear store in Barbados.

30.     In addition to the fictitious financing, Bryant and Kelly caused EIGH to announce falsely that EIGH had acquired two operating businesses. On December 16, 2009, they caused EIGH to issue a press release stating that EIGH had acquired Southbridge Development Group, Inc. ("Southbridge"), a real estate development company located in Alpharetta, Georgia.  In a September 15, 2010 press release that they caused EIGH to issue, EIGH claimed that it had

8

acquired Monk's Den, an investment program owned and operated by a stock promoter, Jerry Williams.

31.     While Bryant entered into actual or proposed acquisition agreements with both Southbridge and Monk's Den on behalf of EIGH, the company never acquired either business because the acquisitions were never closed. The Southbridge acquisition failed to close because EIGH failed to remit the $1.5 million to Southbridge that Bryant promised it would invest in the company.

32.     Bryant and Kelly also propagated misinformation about EIGH's revenues. Between November 2009 and October 2010, EIGH conducted no, or nominal, operations and did not generate any revenues. Nevertheless, Bryant and Kelly, on behalf of EIGH, submitted and published on OTC Markets financial reports for EIGH for the three months ended March 31, 2010, and the three months ended June 30, 2010 reflecting $310,792 and $372,618 in quarterly revenues, respectively. They also attributed more than $100,000 of the fictitious revenues to nonexistent sportswear sales.

33.     Moreover, Bryant and Kelly caused EIGH to report baseless and misleading revenue projections for EIGH. On December 16, 2009, Bryant and Kelly caused EIGH to issue a press release stating that a real estate project underway by the company's alleged wholly-own subsidiary, Southbridge, had contracts delivering $25 million in gross revenue. The project, however, was only in the developmental stage and not generating any revenues.

34.     In the same press release that EIGH announced its alleged acquisition of the Monk's Den investment program, Bryant and Kelly caused EIGH to state that it expected the investment program to generate $5 million in revenues for EIGH in 2010. Two days later, on September 17, 2010, they caused EIGH to issue another press release forecasting that the

9

investment program would generate $10 million in revenues in 2011. Bryant and Kelly had no factual basis to make those projections.

35.     Bryant and Kelly also caused EIGH to make baseless and misleading revenue projections for two other businesses that EIGH purportedly acquired as wholly-owned subsidiaries. On January 14, 2010, they caused EIGH to make a press releases representing that The Breitinger Agency, the Canadian modeling agency, was targeting $1 million in revenues for the year. On February 5, 2010, they disseminated a second release stating that a real estate company that EIGH had acquired in Barbados, Skyvillas Realty, Inc., had closed contracts for the sale of $10 million worth of property and had pending sales of $5.6 million. However, neither EIGH nor Bryant nor Kelly had any bases or support for the forecasts when they were made.

36.     On September 15, 2010, and September 17, 2010, after months of reporting fictitious capital and revenue information for EIGH, Bryant and Kelly caused EIGH to issue two press releases announcing that the company planned to pay its stockholders a $0.10 per share dividend on October 15, 2010. The dividend announcement had a substantial effect on EIGH's stock price.

37.     As Bryant and Kelly had intended, the financial reports and the press releases they began disseminating in November 2009 increased the trading volume in EIGH's securities and the company's stock price. Daily trading volume rose 93% from approximately 114,692 shares to approximately 1,448,225 shares, and the company's stock price rose from $0.01 per share to $0.22 per share just before the dividend announcement. Following the dividend announcement, EIGH's stock price reached a high of $0.42 per share.

10

38.     EIGH did not pay the dividend.   On October 14, 2010, Bryant and Kelly disseminated a press release, that they caused EIGH to issue, claiming that the company was unable to pay the dividend because it had improperly recognized a $40 million cash windfall that it had reported at the same time it announced the dividend.   In truth, there was never any $40 million cash windfall and EIGH did not pay the dividend because the company did not have any capital or revenues.

## D.  BRYANT AND KELLY FRAUDULENTLY SOLD EIGH'S SECURITIES WHILE DISSEMINATING THE FALSE REPORTS AND RELEASES.

39.     As Bryant and Kelly disseminated the false financial reports and press releases that EIGH issued, Bryant, directly and indirectly, sold 56.8 million of the 69.7 million restricted shares that he acquired from the Former CEO into the market.

40.     Bryant deposited 29.5 million of the restricted shares he acquired from the Former CEO to a brokerage account that he maintained in his own name.  Between December 2009 and October 2010, Bryant sold 19.3 million of the restricted shares from his account into the market for approximately $1.4 million.

41.     Bryant sold the remaining 37.5 million restricted shares he acquired from the Former CEO to the Loan Company for approximately $1.5 million.  Bryant and the Loan Company structured the stock sales as purported loan transactions with the shares serving as collateral for the proceeds.  However, the loan agreements between Bryant and the Loan Company were a sham because neither party expected that Bryant would fully repay the loans or that the Loan Company would return the shares to Bryant.  The loan agreements explicitly provided the Loan Company could sell the shares and, in fact, it sold all of the shares it acquired from Bryant into the market between February and April 2010.  Moreover, although Bryant

defaulted on the loans after making two small installment payments the Loan Company forgave his entire debt.

42.     Duncan enabled the sales of EIGH's restricted securities by Bryant and the Loan Company. The stock certificates without restrictive legends that he obtained on behalf of Bryant from EIGH's transfer agent allowed Bryant and the Loan Company to deposit the shares in brokerage accounts and sell them into the market as free trading securities.

43.     Kelly also sold EIGH's securities as he and Bryant disseminated the false financial reports and press releases about the company. However, unlike Bryant, Kelly acquired all of the shares that he sold by purchasing them in the market in accounts that he maintained at four different brokerage firms. Between October 2009 and October 2010, Kelly generated approximately $264,000 from his purchases and sales of EIGH's securities in the secondary market.

### E. THE DEFENDANTS FRAUDULENTLY CONCEALED BRYANT'S SALES OF EIGH'S RESTRICTED SECURITIES.

44.     Between October 2009 and October 2010, EIGH's common stock was quoted on Pink Sheets, a central market for the quotation of penny stocks operated by OTC Markets. From approximately 6:00 a.m. to 4:00 p.m. each business day, the inside (bid and ask) quotes in EIGH appeared on Pink Sheets on a real-time basis. Investors used the quotations to place orders for the purchase and sale of EIGH's securities with their brokerage firms.

45.     In addition to quoting EIGH's securities on Pink Sheets, OTC Markets published the false and misleading financial reports it received from Bryant and Kelly on its Website. OTC Markets permitted the quotation of EIGH's securities on Pink Sheets and the publication of the company's financial reports on its Website relying on Adequate Current Information ("ACI")

12

letters that it received from Duncan, who supplied it with twelve such letters as the defendants carried out their scheme to inflate EIGH' stock price.

46.     Duncan provided the ACI letters to OTC Markets at Bryant's direction and averred in all of the letters that EIGH had made adequate and current information available to the public. In fact, Duncan, who reviewed all of the financial reports that Bryant and Kelly published on OTC Markets' Website, knew or should have known this was not the case.

47.     Duncan stated in the ACI letters that he was able to affirm that EIGH had made adequate and current information publicly available because he had met personally with EIGH's management, confirmed EIGH's outstanding shares by letter with the company's transfer agent, and reviewed the company's financial statements prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). However, Duncan did not meet personally with Kelly until July 2010, after providing seven of the twelve ACI letters to OTC Markets. He did not confirm EIGH's outstanding shares in writing with the company's transfer agent between October 2009 and October 2010, and he did not request a stockholder list or history from the transfer agent during that period. Moreover, he could not have reviewed EIGH financial statements prepared in accordance with GAAP because EIGH did not prepare and retain such financial statements.

48.     Neither the financial reports that Bryant and Kelly caused EIGH to publish on OTC Markets nor the press releases that they disseminated through the wire service disclosed Bryant's control of EIGH or his acquisition and sale of its securities. Duncan knew or should have known of Bryant's control over EIGH because Bryant retained and paid him to provide legal services to the company, and Bryant directed Duncan as to almost actions concerning the company's securities and business matters. Bryant also informed Duncan that he had appointed

13

Kelly CEO of EIGH, and Duncan observed Bryant directing Kelly's actions. Further, Bryant directed Duncan as to the disposition of all the restricted securities he acquired from the Former CEO, and Duncan prepared the legal opinions concerning Bryant's sale of the securities. Duncan nonetheless warranted in the ACI letters he provided to OTC Markets that there was adequate and current information about EIGH available to the public.

49.     The Defendants sought to conceal Bryant's sales of EIGH's restricted securities by not disclosing his controlling stock interest in the company. Moreover, to explain the discrepancy between the increase in trading volume that resulted from Bryant's restricted stock sales and the understated stock float figures that Bryant and Kelly disclosed in EIGH's financial reports, EIGH, Bryant, and Kelly disseminated press releases and other written statements to EIGH's stockholders and the Commission claiming that the brokers making a market in EIGH's securities were engaged in abusive naked short selling. In fact, this was untrue because the bi-weekly short interest in EIGH never exceeded 0.1% of the company's outstanding securities between October 2009 and October 2010.

## F. DUNCAN MADE FALSE REPRESENATIONS TO THE DEPOSITORY TRUST AND CLEARING CORPORATION CONCERNING EIGH.

50.     In April 2010, EIGH submitted an application to the Depository Trust and Clearing Corporation ("DTC") requesting DTC provide EIGH with book entry and continuous-net-settlement services for its common stock. The same month, Duncan provided DTC with an opinion letter and a stock certificate for one million shares of EIGH registered to Kelly. In his opinion letter, Duncan stated that Kelly was not an affiliate of EIGH and had acquired the shares from EIGH more than a year earlier although he knew that Kelly was serving as CEO of EIGH and he had prepared an opinion letter for Kelly's shares reflecting that Kelly had acquired the shares from Bryant on March 23, 2010. In July 2010, Duncan provided DTC with a second

14

opinion letter and another stock certificate for one million shares registered in his name. In his second opinion letter, Duncan stated that he had acquired the shares from EIGH more than 13 to 36 months earlier although he had received them from Bryant on April 6, 2010. Duncan misstated the dates on which he and Kelly had acquired the shares and from whom they had acquired the shares to conceal the shares were restricted securities.

51.    In addition to the one million EIGH shares that Bryant conveyed to Duncan on April 6, 2010, Bryant paid Duncan more than $15,000 from the proceeds of his restricted stock sales to the Loan Company for the legal services that Duncan provided EIGH. Duncan was subsequently impeded from selling the one million shares that he received from Bryant when the Commission issued an order on November 4, 2010, suspending trading in EIGH's securities.

## COUNT I
### Fraud in the Offer and Sale of Securities
### Violations of Sections 17(a) of the Securities Act
### (Against EIGH, Bryant, and Kelly)

52.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

53.    Defendants EIGH, Bryant, and Kelly, by engaging in the conduct described above, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails: (a) with scienter, employed devices, schemes, or artifices to defraud; (b) obtained property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; and/or (c) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

15

54.     By engaging in the conduct described above, the Defendants violated, and unless enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3)  of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

### COUNT II
#### Fraud in the Offer and Sale of Securities
#### Aiding and Abetting Violations of Sections 17(a) of the Securities Act
#### (Against Defendants Bryant, and Kelly)

55.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

56.     Defendants Bryan and Kelly provided substantial assistance to EIGH in the offer or sale of its securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, by (a) employing devices, schemes, or artifices to defraud; (b) obtaining property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; or (c) engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

57.     By engaging in the conduct described above, Defendants Bryant and Kelly aided and abetted EIGH's violations, and unless enjoined will continue to aid and abet violations of, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2), and 77q(a)(3)].

### COUNT III
#### Violation of Section 17(a)(2)
#### (Against Duncan)

58.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

59.     Duncan, by engaging in the conduct described above in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails obtained property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading.

60.     By engaging in the conduct described above, Duncan violated, and unless enjoined will continue to violate, Section17(a)(2) of the Securities Act [15 U.S.C. §§ 77q(a)(2)].

### COUNT IV
### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c)
### (Against EIGH, Bryant, and Kelly)

61.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

62.     The Defendants, by engaging in the conduct described above, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail:  (a) employed devices, schemes, or artifices to defraud or (b) engaged in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

63.     By engaging in the conduct described above, the Defendants violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and 10b-5(c) [17 C.F.R. § 240.10b-5(a) and § 240.10b-5(c)].

### COUNT V
### Fraud in Connection with the Purchase or Sale of Securities
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)
### (Against EIGH)

64.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

17

65.     Defendant EIGH, by engaging in the conduct described above, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail made untrue statements of material fact or omitted to state material fact(s) necessary to make the statements made not misleading.

66.     By engaging in the conduct described above, Defendant EIGH violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)].

## COUNT VI
### Fraud in Connection with the Purchase or Sale of Securities
### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against Defendants Bryant and Kelly)

67.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

68.     Defendants Bryant and Kelly provided substantial assistance to EIGH in connection with the company's purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail, by: (a) employing devices, schemes, or artifices to defraud; or (b) making untrue statements of material fact or omitting to state material fact(s) necessary to make the statements made not misleading; or (c) engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

69.     By engaging in the conduct described above, Defendants Bryant and Kelly aided and abetted EIGH's violations, and unless enjoined will continue to aid and abet violations of, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5(b)].

18

## COUNT VII
**Fraud in Connection with the Purchase or Sale of Securities**
**Control Person Liability for Violations of Section 10(b) & Rule 10b-5(b)**
**(Against Defendant Bryant)**

70.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

71.     Defendant Bryant possessed, directly or indirectly, the power to direct or cause the direction of the management and policies of EIGH that resulted in EIGH's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)]. Defendant Bryant was also a culpable participant in EIGH's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)]. Bryant was therefore a control person of EIGH for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

72.     By engaging in the conduct described above, Defendant Bryant is liable as EIGH's control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for EIGH's violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5(b) [17 C.F.R. §240.10b-5(b)].

## COUNT VIII
**Unlawful Distribution and Sale of Securities**
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(By Defendants Bryant and Duncan)**

73.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 51 above as if set forth fully herein.

74.     Defendants Bryant and Duncan, by engaging in the conduct described above, through the use or means or instruments of transportation and communication in interstate

commerce or of the mails offered to sell or sold securities, or carried such securities through the mail or interstate commerce for the purpose of sale or delivery after sale.

75.     No registration statements were filed with the Commission or were in effect with respect to the offer or sale of EIGH's securities.

76.     By engaging in the conduct described above, Defendants Bryant and Duncan violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §77e(a)&(c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Find that each Defendant committed the violations charged and alleged herein;

B.     Enter a permanent injunction restraining each Defendant and their officers, agents, servants, employees and attorneys, and those in active concert or participation with them, who receive actual notice of the order by personal service or otherwise, and each of them, from further violations of the relevant securities laws identified above;

C.     Order the Defendants to disgorge all ill-gotten gains from the illegal conduct alleged herein, together with prejudgment interest thereon;

D.     Order the Defendants to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

E.     Order that defendants Bryant and Kelly be permanently barred from serving as an officer or director of any public company issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], as authorized by Section 20(e) of the

Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)].;

F.      Order that Bryant, Kelly and Duncan be unconditionally and permanently prohibited from participating in any offering of a penny stock, as authorized by Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6)(B) of the Exchange Act [15 U.S.C. § 78u(d)(6)(B)];

G.      Order that Duncan be unconditionally and permanently prohibited from participating in the preparation or issuance of any opinion letter in connection with the offer or sale of securities pursuant to, or claiming an exemption under Section 4(1) of the Securities Act [15 U.S.C. § 77d(1)], and Rule 144 or Rule 802 under the Securities Act [17 C.F.R. §§ 230.144 and 230.802], including without limitation, signing an opinion letter or preparing an opinion letter to be signed by another person, related to such offering;

H.      Retain jurisdiction of this action to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

21

Award such other and further relief as the Court deems just and proper.


Dated: New York, New York
       September 27, 2012


                          Respectfully submitted,

                          Valerie A. Szczepanik
                            Assistant Regional Director
                            SzczepanikV@sec.gov
                          Attorney for Plaintiff
                          SECURITIES AND EXCHANGE COMMISSION
                          3 World Financial Center – Suite 400
                          New York, NY  10281-1022
                          Telephone No.: (212) 336-0175
                          Facsimile No.:  (212) 336-1353

Of Counsel:
Deena Bernstein*
  Senior Trial Counsel
  BernsteinD@sec.gov
Kevin M. Kelcourse*
  Assistant Regional Director
  KelcourseK@sec.gov
Susan Curtin*
  Senior Counsel
  CurtinS@sec.gov
SECURITIES AND EXCHANGE COMMISSION
33 Arch Street, 23rd Floor
Boston, MA  02110
Telephone No.: (617) 573-8900
Facsimile No.:  (617) 573-4593

*Not admitted in the S.D.N.Y.