UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>8000, INC., JONATHAN E. BRYANT, THOMAS J. KELLY, and CARL N. DUNCAN,<br><br>Defendants. | CIVIL ACTION<br><br>NO. 12-cv-7261 |

## DECLARATION OF THOMAS J. KELLY

I, Thomas J. Kelly, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I graduated from Cheltenham High School in Philadelphia, Pennsylvania in 1986, received an Associate's Degree in General Education from Montgomery County Community College, and attended Temple University where I studied Sports Management, but did not graduate.

2. I opened and operated a dollar store called Dollar Kingdom in Plymouth Meeting, Pennsylvania for about three-and-a-half years from 1997 to 2000.

3. During that time, I worked in and managed the store with four to five full-time employees—sometimes more during the holidays.

4. I opened the dollar store, and there was an Acme in the mall that was an anchor store, which is crucial to the success of a dollar store, because you have to sell volume of items to make money, because everything is a dollar.

5. The Acme went out of business and the foot traffic went away. The landlord told me that a Genuardi's was coming, but it didn't and I hung on and started to spend everything I ever had, and I couldn't afford to pay it anymore.

6. I filed for bankruptcy after the dollar store closed, and started working as an apprentice for an appraisal company called Tech Review in Blue Bell, Pennsylvania from 2001 until about 2004.

7. I have been a certified real estate appraiser in Pennsylvania since 2005.

8. After I left tech review, I left to join another appraiser at a different appraising business called Atlantic Coast Real Estate Appraisers, where I worked from 2005 through 2007.

9. In 2007, I went off on my own as an appraiser. When I was with Atlantic Coast, there was another partner who was older, and I am more hungry. I can work seven days a week. I didn't have much of a social life at the time. So I opened up Platinum Real Estate & Appraisals, which I still own and operate out of my home today.

10. Other than my work with Atlantic Coast and Platinum Appraisals, my past role as CEO of 8000, Inc., is my only experience as an officer or director of a company.

11. Other than my real estate appraiser license, I do not have any other professional licenses. I do not have any financial planning or securities licenses.

12. My individual stock investing career began in mid-late 2005, when I purchased some Sirius satellite radio stock. I opened up an account on TDAmeritrade and bought my stock. I got a spam email from (I think it was called the bellwether report, an email advertisement)

DM1\4313208.1

about a stock called Medify Solutions. I did a little due diligence and bought some stock. I liked what I read about this hand-held remote technology for patient medical notes in real live time for doctors around the world. I bought stock in the company ($10,000). This was my first time investing in the stock market other than my Roth IRA mutual fund (that is now worth less, due to me buying 8000, Inc. stock with it). I didn't know how to trade stocks, all I knew was to buy and hope it went up, and then sell for a profit.

13.   After Medify solutions started going down in share price, I and many others were concerned but still loyal shareholders. I was able to ask questions on a blog and get answers from the CEO Jonathan Bryant. I eventually emailed the Jonathan Bryant and asked him about the company, and told him I was a loyal shareholder. We had started communicating in mid to late 2006, and during 2007 became very good friends. He always told me that great things would happen with the company and suggested that I invest in the company. Many press releases involving Oracle, and other big names were mentioned.

14.   I was very impressed with Jonathan's intellect and achievements in this business arena. He had told me about medical journals that he had written at University in London. He sent me the articles and again I was very impressed. We were both athletes in high school and university ... so he told me. He said that he was a professional soccer player in London, again very impressed. He was the father of 1 girl, 2 boys, and a step-daughter. Jonathan is older than me and I looked up to him like an older brother that I never had.

15.   I pride myself on being a stand up person with a work ethic second to none, more loyalty than anyone can ask for, kind hearted, honest, smart and always striving to be the best that I can be. I have my parents to thank for all that I am today.

16. My knowledge of business comes from tripping, falling and getting back up with my dollar store experience, and being the owner operator of an appraisal business. At the time, I saw a lot of myself in Jonathan as he was a step-father, former athlete, business owner, and similar goals of being successful that it made me feel closer to him as a loyal friend. His stories about being a professional soccer player in London, his ideas of how he came up with the Medify solutions device to eliminate paper notes in the medical arena were just amazing to me.

17. Question and answers on a blog turned into personal emails back and forth to Jonathan Bryant about the company and getting to know him. I really took a liking to him thinking how smart he was, how educated he was, and being the CEO of a public company who was becoming a friend to me. As 2006 went on there were many things happening in my friends life and his company. He told me that others in the industry sabotaged and financially hurt his abilities to do business and things were getting very bad. We started talking to each other on a personal basis. He would ask me about my family and always gave me advice on different things that I had going on in my life whether it be health issues, women, business, sports, life, etc. We became very close as friends and I hated that people were taking advantage of Jonathan and his ability to grow the business.

18. Eventually, I would start sending him and his family money as he was falling on a very desperate time with his kids, food, mortgage payments, heating system, etc. At first it was a couple hundred here and there, but then became more. I told Jonathan everything about me, and maybe even boasted a bit about myself to appear on a similar level as him even though I thought I wasn't even in his class.

19.     Thinking back on it now, I remember telling Jonathan about my business and building myself as a little more than I was to show him that I was worthy if he ever wanted to expand in business, as I would love the opportunity to worth with him.

20.     As Medify moved forward with what I thought were the ups and downs of any normal business, Jonathan would always talk about how good things would be, how exciting the future was, etc. I continued to invest in the company. As time went on, and the share price went down, or I noticed that selling was occurring and didn't understand, I asked Jonathan and he would give me great reasons all the time as to why there was selling. I believed every word he ever said to me.

21.     Mr. Bryant started opening up to me about how Medify was getting brought down by others that wanted him to fail, and he saw an opportunity to save the company by doing a reverse merger into another company. I didn't know a lot of what Jonathan was talking about when he discussed with me how the company would buy another company but I trusted my friend.

22.     At one point, in late 2007, Jonathan explained to me why he had to step down as CEO of Medify and he was still a majority shareholder but wanted to move on to bigger and brighter things (including me in the future). His reason for leaving Medify seemed 100% justified to me at the time. He said that he wanted to let the other corporate guys handle the company and that he needed a change. I believed every word, and moved forward.

23.     The company eventually reversed merged into PETEL, Inc. I think I bought and sold more with the new company, and took a loss. Upset with my investment, Jonathan always

knew what to say to me, and I believed every word as gospel. He was always doing, or talking about brokering deals in the market and I thought it was normal at the time.

24. Jonathan told me that EIGH Cannonball 8000 was a lifestyle company out of London with millionaires and awesome cars, with rallies that were held in different countries. It was going to be this huge lifestyle company.

25. In the fall of 2009, Jonathan asked me to go into business with him. He told me that 8000 (EIGH) had filed for bankruptcy and that Jonathan had purchased the shell company from the former CEO, Conrad Wall.

26. Jonathan told me that he could not be the CEO because of something having to do with his not being able to gain collateral money of more than 10% of shares held by an office. It was a bit unclear to me, but I trusted him, and thought he trusted me. I agreed to be the CEO.

27. Jonathan would bring up opportunities and tell me about them. I never had any reason to doubt him. There were these acquisitions and sponsorships, and I got excited about the company and thought, "wow," this is going to be huge. Jonathan would write press releases about these deals and I would sign off on them.

28. I guess now I know that a lot of what Jonathan told me was not true. But I thought that we had acquired—and I signed off on press releases about: the Breitinger Modeling Agency in November 2009; a company called Sky Villas in December 2009; and Southbridge Development Group in January 2010.

DM1\4313208.1

29.  Jonathan also told me about, and gave me press releases that we issued in January through March of 2010, about all of the exciting things that 8000, Inc. was doing with these businesses.

30.  Jonathan also showed me photographs, an store that he said was going to sell our clothes, t-shirts, and told me all about the sponsorships we were doing to build the brand.

31.  In February 2010 and again in June 2010, Jonathan invited me and my fiancé to visit Barbados.

32.  I paid for our travel costs, but we stayed at Jonathan's in February and at another house in June. During and around those visits, Jonathan showed me all kinds of things that we were doing with the store and the brand and the sponsorships.

    a.  Jonathan showed me samples of the "Brand8000" online.

    b.  He ordered clothing for the Amateur Athletic Association of Barbados that we were sponsoring.

    c.  He took me to meet with someone he said was the Athletic Director of the Amateur Athletic Association of Barbados to hand over a check for $25,000 for our sponsorship. Jonathan even let me hand the Director the check.

    d.  Jonathan took me to a track meet that Jonathan said we were sponsoring, and I sat next to the Director of the Amateur Athletic Association of Barbados.

    e.  Jonathan showed me drawings of our store in Lime Grove—an upscale shopping center that we would be a part of when it was finished.

    f.    When I was in Barbados, Jonathan took me to see where the store would be. It was under construction in the shopping center.

    g.    Jonathan showed me 30 or more boxes that he said had clothes with our brand.

    h.    At a hotel near a golf course where the golfers all come in from the course, Jonathan set up banners and an 8000 sign and a drawing of what our sponsored race car would look like.

33.    Throughout 2010, there numerous press releases including sponsorship of gold tournaments, other athletic Olympic games for the Athletic Association of Barbados, quarterly reports, and investor updates. I didn't fully understand all of the information in the press releases but they were all explained to me by Jonathan, and I believed and trusted him 100%.

34.    Whenever I asked Jonathan if something was legal or if we needed an attorney for something, he always referred to our Great former SEC attorney, Carl Duncan.

35.    I started complaining to Jonathan about all the money and time that I had put into him and the company and he said that I should sell some stock. Then I specifically asked Carl Duncan how much I was allowed to sell and when as I did not know the legalities since I was an officer of the Company.

36.    When I was subpoenaed by the SEC. I did not understand what was happening. The questions that were needed for the deposition w[ere] prepared by Jonathan and Carl. They told me what to say and how to fill out the forms and questionnaire. When I needed to speak with Carl in the other room he would yell at me for not knowing what I was doing. I felt like I

was all alone, and completely shocked that he treated me this way. Only now with new counsel and the FBI do I realize that I was a puppet.

37. The FBI came to talk to me after my SEC testimony. Words cannot describe what I was hearing from the FBI agents. After realizing that this was not a movie and then having discussions with other professional people and most importantly Mike Mustokoff, did I see that what does happen on TV happened to me.

38. I made recordings of calls with Jonathan and Carl Duncan for the FBI.

39. Kendra McLamb of the FBI said to my face after getting to know me "Tom don't change who you are and don't stop having faith in others because that's what I love about you."

40. On June 12, 2012, I submitted a letter to Sue Curtin with the SEC, through my counsel, Michael M. Mustokoff, Esq. A true and correct copy of that letter, which is incorporated by reference herein, is attached hereto as Exhibit "1".

41. Through my counsel, I submitted financial information to the SEC throughout the course of this matter, including written responses and supporting documents to the SEC's questions concerning my finances and the $171,252.32 of expenditures that I made on behalf of EIGH. A true and correct copy of the written responses, which is incorporated by reference herein, is attached hereto as Exhibit "2".

42. I used my credit card to pay for EIGH press releases, for virtual office space, for filing fees, and $15,000 for Mr. Duncan to represent me at the SEC.

Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

Executed on October 2?, 2013.

_____
Thomas J. Kelly

# EXHIBIT 1

Dear Ms Curtin,

I wanted to write you a letter because since I met you in Boston, my world has turned upside down. I would like to say for the record that everything I told you in Boston was instructed to me by Jonathan and Carl Duncan. I truly thought and believed that Carl Duncan was a former top SEC attorney and everything he said to me I took as gospel. I don't even know where to begin with all that has happened to me. Prior to meeting Jonathan Bryant over the internet in early 2007, I was working as a real estate appraiser and doing very well. I work very hard, and quoting my mother "Thomas you work too hard" but I get my work ethic from my hard working parents. My mother was a nurse for 20 years after having all 5 of us, and my father worked for the Teamsters (ACME markets) for 40 years. I have the best parents any son could ever ask for, and what they have instilled in me over the years is what made me who I am today. I would never in a million years try to scam people out of anything, because I was not brought up that way. I started researching Jonathan Bryant's company Medify solutions and bought some stock. He was the CEO at the time, and he openly spoke with investors over the internet chat forums. I continued to lose money in this company, however being in business myself and going through a failed business myself I know what it takes to be successful and that 9 out of 10 businesses fail. You must believe in what you do, set attainable goals, and work as hard as you can to reach them. I really believed in Jonathan and his company Medify Solutions. We eventually became friends, even though I lost a large investment of $75,000 over a couple years. Jonathan became like an older brother to me that I never had. He had advanced degrees in Micro Biology, and other sciences. He sent me journals of some things that he wrote or discovered in his fields, and we had many conversations over the course of time were he would tell me so many scientific things that blew my mind. I believe I'm a smart person, and I will put my faith in people 100% when I feel they are decent people. I've been told that I'm very lucky to have a group of 8-12 very good friends since I was 12 years old. I am 44 years old now, and they are all still very close to me, and range from teachers to UPS delivery drivers. My point of all this is to let you know what kind of person I am and where I came from. I know now that I was fooled by a scam artist. When the FBI came to my house shortly after I met you Ms Curtin, I wish you could have seen my face. I thought I was in a movie, or a bad dream. I don't want to bore you with a very long letter, so I will try and keep this short. The FBI agents Kendra McLamb and Mark Digiovani were very nice; however they told me things that were the exact opposite of what I believed for 3 + years. You have to realize that I believed in Jonathan and Carl Duncan like I would believe a police officer on the corner in my neighborhood, or a teammate on the baseball field. More than a teammate, however, these were people that I felt were far more knowledgeable in these matters than me. I would not have sold the stock without their advise. I started complaining to Jonathan about all the money and time that I had put into him and the company and he said that I should sell some stock. Then I specifically asked Carl Duncan how much I was allowed to sell and when as I did not know the legalities since I was an officer of the company. Words cannot describe what I was hearing from the FBI agents. After realizing that this was not a movie and then having discussions with other professional people and most importantly Mike Mustokoff, did I see that what does

happen on TV happened to me. I would like to also tell you that Kendra McLamb of the FBI said to my face after getting to know me "Tom don't change who you are and don't stop having faith in others because that's what I love about you" Please talk to Ms McLamb from the FBI, and she can tell you a lot more about me and my life. I have a wonderful fiancé who has 2 great kids that I love and treat them as my own. Without repeating myself too much Ms Curtin, I would never ever do anything that could possibly put my family in harms way. I've made mistakes in life, but I accepted what ever happened 100% and never tried to cheat anyone out of anything. I have to say that this is the most emotionally draining situation I have ever experienced Ms Curtin, and it really hurt me to think I was lied to and deceived by someone who I thought was a friend, and a professional SEC attorney (so I thought). The questions that were needed for the deposition where prepared by Jonathan and Carl. They told me what to say and how to fill out the forms and questionnaire. When I needed to speak with Carl in the other room he would yell at me for not knowing what I was doing. I felt like I was all alone, and completely shocked that he treated me this way. Only now with new council and the FBI do I realize that I was a puppet. I know it sounds stupid, but I guess that's what happens when you trust someone. Both Carl and Jonathan really got on me hard and kept asking me for more money to pay for legal bills, and filing document fees which I did until I met the FBI agents and learned the truth. I pride my self on how hard I work, and the people that I surround myself with. I have the greatest family and friends anyone could ask for in the world. I don't want to take up too much of your time and, I respect what ever your decision is Ms Curtin, but I wanted to tell you a little about myself and that if I new then what I know now..... I would have never been in the situation I found myself. I gave Jonathan Bryant my whole 100% attention and a lot of money towards a goal of a big business. I slowed my appraisal business down to a snails pace and lived off my credit cards/ line of credit for a time. The FBI has emails, and recorded conversations of where Jonathan and his wife would ask me for more money like I gave them in the past. After the real estate and financial crash, I am working day and night to catch up and pay back bills and feed my family. This was an experience that I will never forget until the day I die. Thank you for taking the time to read this, and I look forward to your response.

Yours truly,

*Thomas Kelly*

Thomas Kelly

# EXHIBIT 2

Follow up to the financial statement as of April 23, 2012

1. Describe the nature of the sales and W2 income disclosed on the projected profit and loss statement for the period January 1, 2011, to December 31, 2011.

>   The gross sales derived from the 2011 Profit and loss were from my appraisal business (owned and operated by Thomas Kelly).
>   The W2 income was paid out of the 2011 sales (revenue) from the appraisal business.

2. Identify the recipients of the gross payroll identified on the projected profit and loss statement for the period January 1, 2011, to December 31, 2011.

>   There are 2 recipients that receive payroll.
>   1. Thomas Kelly
>   2. Lisa Mariello (admin. Assistant)

3. Please provide copies of Exhibits A through D referenced in the Statement of Assets and Liabilities as of April 23, 2012.

>   See attached copies

4. Separately specify the value of and mortgage on each of the properties included in the Real estate identified in the Statement of Assets and Liabilities as of April 23, 2011.

>   See attached real estate property list. Exhibit E

5. Identify each of the judgments and settlements identified in the statement of Assets and Liabilities as of April 23, 2012.

>   The settlements were from a payment plan established with the IRS

6. Describe the use and disposition of the proceeds that Mr. Kelly received from the sale of securities in EIGH between October 2009 and November 2010.

>   The disposition of the proceeds from shares sold covered all expenses/ out of pocket costs including: money spent on international phone costs, postage, email marketing and campaigns, legal fees, virtual office expense, western union wires, advertising, air travel, press release expense, office expense, website domain cost, stock purchase from IRA account that was deemed worthless and not able to sell.

7. Identify and provide records that support all funds Mr. Kelly expended on behalf of EIGH.

>   Total funds expended $171,252.32
>   See exhibit F for copies of receipts/invoices.